**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEITH B.,[1] | ) Case No. CV 19-7079-JPR |
| Plaintiff, | ) |
| | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **REVERSING COMMISSIONER** |
| ANDREW SAUL, Commissioner of Social Security, | ) |
| Defendant. | ) |

**I. PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed June 25, 2020, which the Court has taken under submission without oral argument.

---

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

For the reasons stated below, the Commissioner's decision is reversed.

## II. BACKGROUND

Plaintiff was born in 1965. (Administrative Record ("AR") 63.) He completed three years of college and worked in real estate and jewelry sales and as an advisor for an internet security company. (AR 200.)

On November 9, 2015, Plaintiff applied for DIB, alleging that he had been unable to work since November 4, 2015, because of anxiety, mood, personality, bipolar, major-depressive, and attention-deficit/hyperactivity disorders; spinal stenosis; bulging and herniated discs; and disc tears. (AR 182, 195, 199, 208-15.) After his application was denied, he requested a hearing before an Administrative Law Judge. (AR 72, 76, 78-79.) A hearing was held on July 5, 2018, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (See AR 38-61.) In a written decision issued July 30, 2018, the ALJ found that based on Plaintiff's age, education, work experience, and ability to perform light work, he could adjust to other work as a garment bagger, basket filler, or cleaner and polisher. (AR 32-33; see AR 23-33.) Plaintiff requested review from the Appeals Council, including with his appeal an MRI taken three months after the ALJ's decision; the council denied review on June 20, 2019. (AR 1-7, 240-44.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and

supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is "more than a mere scintilla but less than a preponderance." Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for Social Security purposes if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

    A.   <u>The Five-Step Evaluation Process</u>

An ALJ follows a five-step sequential evaluation process to

assess whether someone is disabled. 20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 404.1520(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii) & (d).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017)
(continued...)

4

past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy, the fifth and final step of the sequential analysis. § 404.1520(a)(4)(v).

B. <u>The ALJ's Application of the Five-Step Process</u>

To start, the ALJ found that Plaintiff met "the insured status requirements of the Social Security Act through December 31, 2019." (AR 25.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since November 4, 2015, the alleged onset date. (<u>Id.</u>) At step two, he concluded that during the relevant period, Plaintiff had the severe impairments of "major depression with anxious features, attention deficit disorder, degenerative disc disease, herniated nucleus pulposus[3] and stenosis of the lumbar spine[4] and obesity." (AR

---

[2] (...continued) (citing § 416.920(a)(4)).

[3] Herniated nucleus pulposus, also known as a herniated disc, "describes the condition when the intervertebral disc is injured, and its contents are bulging or protruding into the spinal canal." <u>Herniated Disc</u>, USC Spine Ctr., https://www.uscspine.com/conditions-treated/neck-disorders/herniated-disc (last visited Feb. 1, 2021).

[4] Spinal stenosis is a narrowing of the spinal canal.
(continued...)

26.) At step three, he determined that Plaintiff's impairments did not meet or equal a Listing. (AR 27.)

At step four, the ALJ found that Plaintiff had the RFC to perform a "range of light work." (AR 29.) Specifically, he could

> lift and/or carry twenty pounds occasionally, ten pounds frequently, stand and/or walk six hours and sit six hours in an eight-hour workday. The claimant can occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. The claimant must avoid concentrated exposure to uneven terrain, wetness, unprotected heights and dangerous moving machinery. The claimant is limited to reasoning level 2 jobs — he can apply common sense understanding to carry out detailed but uninvolved written or oral instructions and he can deal with problems involving a few concrete variables. The claimant can have no more than occasional contact with the public.

(Id.)

In light of Plaintiff's inability "to provide a clear account of his past work," among other things, the ALJ did not make a finding on whether Plaintiff was able to perform his past relevant work and instead "expedite[d] the claim to Step 5 of the sequential evaluation." (AR 32.) Because his "ability to

---

[4] (...continued) Medical Definition of Spinal Stenosis, MedicineNet, https://www.medicinenet.com/spinal_stenosis/definition.htm (last visited Feb. 1, 2021).

perform all or substantially all of the requirements" of light work "ha[d] been impeded by additional limitations," the ALJ relied on the VE's testimony to conclude that he could perform at least three light, unskilled occupations available in substantial numbers in the economy. (AR 33.) Accordingly, he found Plaintiff not disabled. (Id.)

**V.  DISCUSSION**

Plaintiff argues that the ALJ failed to (1) "fully and accurately evaluate the medical evidence" or properly develop the record concerning his physical ailments (J. Stip. at 3; see id. at 4-8); (2) "assess Plaintiff's ability to perform, on a function by function basis, all of the exertional and nonexertional functions required to perform light exertion" (id. at 14 (emphasis in original); see id. at 3, 12-18); or (3) properly evaluate his subjective symptom testimony (see id. at 3, 21-30).  As discussed below, remand is warranted based on the ALJ's failure to fully develop the record.  Accordingly, the Court does not reach the other issues.

A.  The ALJ Did Not Fully and Fairly Develop the Record

Plaintiff notes that the ALJ gave "no weight" to the only medical-source opinion evaluating his functional limitations based on his chronic low-back pain — the consulting examiner's — but then failed to obtain another consulting examination or call a medical expert at his hearing, instead "making and relying on his own medical assessment in determining Plaintiff's residual functional capacity." (J. Stip. at 4-5.)  As explained below, remand is warranted on this ground.

1. Applicable law

An ALJ has a "duty to fully and fairly develop the record" and "assure that [a] claimant's interests are considered." Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."). But it nonetheless remains the claimant's burden to produce evidence in support of his disability claim. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (as amended). Moreover, the "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2010) (as amended May 19, 2011) (citation omitted); accord Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). An ALJ has broad discretion in determining whether to order a consultative examination and should do so when "ambiguity or insufficiency in the evidence . . . must be resolved." Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted); see also § 404.1519a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.").

2. Relevant background

　　a. *Medical records relating to Plaintiff's back*

On December 22, 2015, internal-medicine specialist Dr. Iqbal Teli examined Plaintiff and assessed "no physical restrictions."

(AR 257; see AR 255.) Dr. Teli noted that Plaintiff's chief complaint was a history of low-back pain, "continuous" for "many years" at a "6/10 intensity." (AR 255.) Dr. Teli found "no acute distress" and a "normal" gait and stance, and he noted Plaintiff's ability to do a "full" squat, rise from a chair, and get on and off the exam table "without difficulty." (AR 255-56.) He reported full flexion, extension, and rotary movement in the cervical and lumbar spine and full range of movement in the hips, "shoulders, elbows, forearms, and wrists, bilaterally." (AR 256.) "[T]enderness" and "mild spasm of the lower back" were noted, but reflexes were equal in the upper and lower extremities and strength was "5/5" in both. (AR 256-57.) Dr. Teli apparently did not review any imaging, test results, or treatment notes. (See AR 255-57; see also AR 29 ("[T]here is no evidence that Dr. Teli reviewed any medical records and even if he did, he evaluated the claimant in December of 2015 and would have not had the opportunity to review any of the records that were submitted at the hearing level.").)

Treatment notes from palliative-medicine specialist Dr. Perry Stein reflect that he treated Plaintiff for chronic back pain from August 7, 2013, through January 26, 2017. (AR 242, 246-49, 259-315.) On August 7, 2013, he had "severe" lower-back pain and was "unable to don[] socks/shoes, underwear." (AR 246.) Pain was described as "8/10" and was generally worse in the morning. (Id.) Dr. Stein reported positive straight-leg raising on the right at 20 inches; positive left thoracic paraspinal-muscle prominence; partially restricted range of motion of the lumbosacral spine in all planes, particularly in the right

9

rotation; and "all movements guarded." (Id.) The following week, Plaintiff reported having pain relief at times but also "breakthrough pain 10/10" with certain activities, "specifically donning pants" in the morning. (AR 247.) He showed "pain behavior on transfers" and was "guarded." (Id.)

On August 21, 2013, he reported "trying to stand at work" because standing was better than sitting. (AR 248.) Two Percocet[5] tablets reduced his pain to "4-5" from "6-8" of 10 for about two hours. (Id.) Dr. Stein found him "restricted in all planes," "specifically for [right] rotation/flexion," and he had spasms. (Id.) On August 28, 2013, the doctor noted that "globally pain [was] 6/10," with the "worst [at] 9/10," with "no precipitating factors" but worse "first thing in the [morning]." (AR 249.) But overall, Plaintiff "look[ed] less uncomfortable" and "less guarded/stiff." (Id.) At appointments in September and October 2013, Plaintiff reported that his pain level was up and down, he had been doing physical therapy, and he found temporary relief with stretching. (AR 259-61.)

On October 16, 2013, an MRI of Plaintiff's lumbosacral spine found the following:

> At the L5-S1 level, there is disc bulge with facet and ligamentum flavum arthropathy.[6] There is mild narrowing

---

[5] Percocet is the brand name for oxycodone acetaminophen, an opioid based pain reliever. Percocet, WebMD, https://www.webmd.com/drugs/2/drug-7277/percocet-oral/details (last visited Feb. 1, 2021).

[6] Ligamentum flavum arthropathy is disease of the ligaments that connect the laminae of adjacent vertebrae from the cervical
(continued...)

10

>of the canal. There is a far right lateral disc osteophyte complex[7] which touches the exiting right L5 root after it exits the neural foramen.
>
>At the L4-L5 level, there is a degenerated disc with loss of T2 signal. There is diffuse bulge with facet and ligamentum flavum arthropathy. There is moderate stenosis of the canal. There is foraminal narrowing[8] right greater than left without mass effect [sic] on the exiting nerve roots.

(AR 262-63.)

Almost a year later, on September 9, 2014, Dr. Stein reported that since his last visit, Plaintiff had received three spinal injections, with an "excellent response" to the first and "less response" to the second and third. (AR 264.) His lower-back pain had become "severe" for three to four weeks before the appointment, and he also had "severe leg pain." (Id.) It was noted that another doctor had "stopped" Plaintiff's prescription

---

[6] (...continued) to sacral spine. Ligamentum Flavum, Physiopedia, https://www.physio-pedia.com/Ligamentum_flavum (last visited Feb. 1, 2021).

[7] Disc osteophyte complex denotes disc protrusion or bone spurs that narrow the spinal canal. Spinal Stenosis & Myleopathy, University of Southern California Spine Center, https://www.uscspine.com/conditions-treated/neck-disorders/spinal-stenosis-myleopathy/ (last visited Feb. 1, 2021).

[8] Foraminal stenosis, or narrowing, is a type of spinal stenosis caused by narrowing or tightening in the small openings between the bones in the spine, called the foramina. What is Foraminal Stenosis?, Healthline, https://www.healthline.com/health/foraminal-stenosis (last visited Feb. 1, 2021).

11

narcotics after a positive "urine drug test [for] THC." (Id.)

At appointments through the end of 2014, Plaintiff reported "some days good others bad," with a "good" day at a pain level of six of 10. (AR 265-68.) He called the doctor's office on February 26, 2015, with severe pain, and Dr. Stein gave him a prescription for hydrocodone, which he finished in about seven days and then struggled without medication. (AR 267.) At an appointment on March 24, 2015, he reported "excru[c]iating pain" in his lower back starting on March 21, which medications had been relieving up until that point. (AR 268.) On April 23, 2015, he "[d]id not have an adequate response to oxycodone,"[9] which "didn't make him pain free," and he ran out in 10 days. (AR 269.)

On May 21, 2015, Dr. Stein's impression was "chronic pain inadequate pain relief on current regimen." (AR 270.) He noted "pain behavior" with transfers and "some tenderness to percussion of lumbar spine." (Id.) He increased fentanyl[10] and recommended acupuncture. (Id.) On June 25, 2015, Dr. Stein noted "chronic pain responsive only to opioid analgesics" and reported that he had "tried multiple therapeutic interventions including [physical therapy] . . . [and] mind body approaches." (AR 271.) Plaintiff

---

[9] Oxycodone is a potentially habit-forming opioid pain reliever. See Oxycodone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682132.html (last visited Feb. 1, 2021).

[10] Fentanyl is used to treat breakthrough pain (sudden episodes of pain that occur despite round-the-clock pain medication) in adult patients who are taking another opiate pain medication and who are tolerant of narcotic pain medication. Fentanyl, MedlinePlus, https://medlineplus.gov/druginfo/meds/a605043.html (last visited Feb. 1, 2021).

believed "fentanyl patches were helpful but only for two days." (Id.) On July 23, 2015, Dr. Stein noted that Plaintiff had texted because he had run out of oxycodone and fentanyl and the pharmacy would dispense only 10 patches. (AR 272.) Plaintiff displayed withdrawal symptoms, acute anxiety, and chronic pain, and the doctor "offered outpatient detox, Suboxone,[11] but [he] declined." (Id.) Plaintiff chose to resume pain medications, and Dr. Stein counseled that he would not escalate the dosage. (Id.) On August 18, 2015, the doctor still diagnosed "chronic pain" and reported that Plaintiff had been "feeling somewhat better lately," but "psychosocially patient [wa]s a disaster" — "[l]iving in a hotel," "[b]roke," and "borrow[ing] money from kids" but "not using illicit drugs" or drinking. (AR 273.) Chronic lower-back pain continued at appointments in September through November 2015, during which Plaintiff reported "severe pain," "exacerbated by bending," and the doctor observed "frequent breath holding and grunting" and counseled him to "lose weight, exercise, avoid a[nxiety], engage in mind/body approach, relaxation." (AR 274-76.) On December 15, 2015, Plaintiff was "in severe pain," had run out of oxycodone, and reported that fentanyl patches helped for only three days. (AR 277.)

On February 25, 2016, Plaintiff reported "pain 10/10" and demonstrated "pain behavior intermittently especially [with] transfers." (AR 278.) On March 22, 2016, Plaintiff "look[ed]

---

[11] Suboxone is the brand name for a combination of buprenorphine and naloxone and is used to treat adults who are dependent on opioids. Patient Information for Suboxone, Suboxone, https://www.suboxone.com/ (last visited Jan. 11, 2021.)

13

better" and had his "sense of humor back," "transfers [and] gait [were] more fluid, less guarded," "no adverse consequences as a result of opioid regimen," muscle spasms were still reported, and oxycodone and fentanyl prescriptions were renewed.  (AR 279.)  On July 14, 2016, Plaintiff reported that his symptoms waxed and waned and he hadn't taken opioids for two weeks, but he later began texting the doctor for pain medications "multiple times" and characterized his lower-back pain as "12/10" on August 30.  (AR 280.)  On November 22, 2016, lower-back pain was "worse than ever," and on December 29 it was "on and off," with fentanyl helping "a bit."  (AR 281-82.)  On January 26, 2017, Plaintiff reported "a bad couple of weeks," and Dr. Stein noted that he had "resisted mind/body approaches" and acupuncture was "too expensive, not covered."  (AR 283.)  Dr. Stein never prepared a functional assessment of Plaintiff's limitations, if any, stemming from his back pain.

The ALJ gave "no weight" to Dr. Teli's opinion "because it [wa]s inconsistent with the objective medical evidence showing degenerative disc disease, herniated nucleus pulposus, and spinal stenosis."  (AR 29.)  It was also "inconsistent with Dr. Stein's treatment notes showing consistent back pain complaints and clinical findings of decreased or pain range of motion, tenderness to palpation and muscle spasms."  (Id.)  Citing his "opportunity to review the entire record" and gain a "more complete picture" of Plaintiff's "medical history and treatment" than Dr. Teli, the ALJ rejected the doctor's opinion and "adopted a more restricted residual functional capacity."  (Id.)

Plaintiff submitted to the Appeals Council an MRI dated

October 18, 2018, three months after the ALJ's decision, finding slightly greater abnormalities than in the 2013 imaging. (J. Stip., Ex. at 1-2.) The Appeals Council found that the new MRI did not "relate to the period at issue" and "[t]herefore did not affect the decision about whether [he was] disabled . . . on or before July 30, 2018." (AR 2.)

        b.   *Plaintiff's statements related to back pain*

In a Disability Report dated March 8, 2016, Plaintiff stated that his "spinal stenosis and herniated discs and tears[] ha[d] made it virtually impossible to remain in the same position for more than a few minutes at a time." (AR 215.) He had tried "every modality" "imaginable" other than surgery, which he had been "warned against" by multiple doctors, with either no or only "[t]emporary [m]inor relief." (Id.) His doctor had "ramped up [his] medications," and he described better and worse days, "hover[ing] between a high 4 on the 'blessing' days to a 10+ on the worst days." (Id.)

At the July 5, 2018 hearing, Plaintiff testified that he had moved from New York to California in November 2017. (AR 49.) His back pain had developed into sciatica on the left side, limiting his ability to sit to between three and 45 minutes at a time. (AR 54-55.)

      3.   <u>Analysis</u>

Plaintiff argues that the ALJ failed to "fully and fairly develop the record" because he gave "no weight" to the only medical-source functional evaluation concerning his back pain, failed to resolve the absence of record evidence by ordering a consultative examination or calling an expert, and concluded

without explanation or support that Plaintiff could perform a light range of work. (J. Stip. at 4-5 (citing AR 29).) He further contends that the ALJ's assessment was contradicted by the treatment notes indicating "very severe pain" and use of "heavy-duty medications." (Id. at 4; see id. at 5-8.)

The ALJ gave "no weight" to Dr. Teli's opinion finding no physical limitations because he examined Plaintiff only in December 2015 and did not review Dr. Stein's treatment notes, the 2013 MRI, or any other tests or records. (See AR 29 (ALJ stating that "there is no evidence that Dr. Teli reviewed any medical records" (citing AR 255-57)), 257 (Dr. Teli noting that no "labs [or] other testing" were "pending" and stating that he had performed a "consultative examination" and "[n]o doctor-patient relationship exist[ed] or [wa]s implied").) The ALJ found severe impairments, including "degenerative disc disease, herniated nucleus pulposus and stenosis of the lumbar spine" (AR 26), relying on Dr. Stein's treatment notes and the 2013 MRI (see id. (citing AR 285)). But in fashioning Plaintiff's RFC for light work, he relied on no other doctor's findings or opinion considering Plaintiff's functional limitations because none existed. Indeed, the entirety of his explanation as to how the medical evidence supported his physical-RFC finding was: "I have given the consultative examiner's assessment little weight, and have adopted a more restricted residual functional capacity." (AR 29.) Because no doctor besides the one whose opinion the ALJ rejected ever assessed Plaintiff's physical functional abilities, the record was inadequate and the ALJ had a duty to develop it

16

further.[12] See McLeod, 640 F.3d at 886 (holding that "inadequacy of the record to allow for proper evaluation triggers a duty of inquiry"); de Gutierrez v. Saul, No. 1:19-CV-00463-BAM, 2020 WL 5701019, at *5-6 (E.D. Cal. Sept. 24, 2020) (remanding because ALJ rejected only medical opinions defining functional limitations, then assessed RFC based on his own lay interpretation of records); Zazueta v. Colvin, No. CV-14-1905-JC, 2014 WL 4854575, at *5 (C.D. Cal. Sept. 29, 2014) (same).

When the record is inadequate, as here, an ALJ has discretion to order a consultative examination.[13] See Reed, 270 F.3d at 842; § 404.1519a. When "additional evidence needed is not contained in the records," a consultative examination is "normally require[d]." Reed, 270 F.3d at 842 (quoting § 404.1519a(b)(1)). Such an evaluation could have clarified the record in this case, but the ALJ did not order one. Instead, he evaluated the MRI and lower-back-pain evidence himself. (AR 29.) Making these assessments without support from any physician's functional assessment was improper. See Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1235 (9th Cir. 2011) (holding that ALJ may not substitute his layperson observations for physician

---

[12] Defendant undermines his own argument by pointing out that treatment notes such as Dr. Stein's that "fail to specify a claimant's functional limits" are "not useful" and "inadequate for determining RFC." (J. Stip. at 9 (citing Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020)).)

[13] An ALJ can also discharge his duty to develop the record fully and fairly by "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Tonapetyan, 242 F.3d at 1150.

17

opinions); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (recognizing that ALJ is "not qualified as a medical expert").[14]

Thus, the ALJ did not fully and fairly develop the record, and remand is warranted on this ground.

B. Remand for Further Proceedings Is Appropriate

When an ALJ errs, as here, the Court "ordinarily must remand . . . for further proceedings." Leon v. Berryhill, 880 F.3d 1041, 1045 (9th Cir. 2017) (as amended Jan. 25, 2018); see also Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended). The Court has discretion to do so or to award benefits under the "credit as true" rule. Leon, 880 F.3d at 1045 (citation omitted). "[A] direct award of benefits was intended as a rare and prophylactic exception to the ordinary remand rule[.]" Id. The "decision of whether to remand for further proceedings turns upon the likely utility of such proceedings," Harman, 211 F.3d at 1179, and when an "ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency," Leon, 880 F.3d at 1045 (citation omitted).

Here, further administrative proceedings would serve the

---

[14] Contrary to Defendant's assertion that Plaintiff has forfeited this argument (see J. Stip. at 10), the ALJ had an independent duty to develop the record regardless of Plaintiff's arguments. See Vasquez v. Comm'r of Soc. Sec., No. 18-cv-1042-EPG, 2019 WL 3714565, at *3 (E.D. Cal. Aug. 6, 2019) (finding no waiver of argument that ALJ fashioned RFC without relying on any medical opinion because ALJ had independent duty to develop record). In any event, Plaintiff did argue to the agency that "this case was never reviewed by any State agency medical consultant (regarding the physical condition)" and therefore should be remanded. (AR 242.)

18

useful purpose of allowing the ALJ to fully develop the record. See Tonapetyan, 242 F.3d at 1151. Because there are no pain-management records from January 2017 to the date of the ALJ's decision and Plaintiff had health insurance for most of that time (see AR 50), the Court has serious questions about whether his low-back pain was disabling during any or all of the relevant period. Moreover, Plaintiff's failure to explore surgery despite his allegedly disabling back pain and Dr. Stein's implicit suggestions that he might have an opioid dependence (see, e.g., AR 272, 283) also counsel caution. For these reasons, too, remand is appropriate. See Garrison v. Colvin, 759 F.3d 995, 1021 (9th Cir. 2014) (recognizing flexibility to remand for further proceedings when "record as a whole creates serious doubt as to whether the [plaintiff] is, in fact, disabled").[15]

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[16] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's

---

[15] On remand, the ALJ can reassess Plaintiff's subjective symptom statements and the RFC after obtaining a functional assessment of his physical limitations, if any.

[16] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

request for remand, and REMANDING this action for further proceedings consistent with this memorandum decision.

DATED: February 2, 2021

*/s/ Jean Rosenbluth*
JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE